J-A16002-17
J-A16003-17

2017 PA Super 269


IN THE INTEREST OF: R.W., A    :    IN THE SUPERIOR COURT OF
MINOR                          :         PENNSYLVANIA
                               :
                               :
APPEAL OF: WESTMORELAND        :
COUNTY CHILDREN'S BUREAU       :
                               :
                               :
                               :    No. 24 WDA 2017

Appeal from the Order December 12, 2016
In the Court of Common Pleas of Westmoreland County
Domestic Relations at No:  65-FN-000083-2014,
CP-65-DP-0000094-2014


IN THE INTEREST OF: R.W., A    :    IN THE SUPERIOR COURT OF
MINOR CHILD                    :         PENNSYLVANIA
                               :
                               :
APPEAL OF: J.R.M.              :
                               :
                               :
                               :
                               :    No. 53 WDA 2017

Appeal from the Order December 15, 2016
In the Court of Common Pleas of Westmoreland County
Civil Division at No:  CP-65-DP-94-2014


BEFORE:  STABILE, J., FORD ELLIOTT, P.J.E., and STRASSBURGER, J.[*]

OPINION BY STABILE, J.:                    **FILED AUGUST 18, 2017**

In these related appeals, the Westmoreland County Children's Bureau

("WCCB" or "Agency") and J.R.M. ("Mother") (collectively, "Appellants")

_____

[*] Retired Senior Judge assigned to the Superior Court.

appeal from the November 2, 2016 permanency review order, as amended on December 12, 2016,[1, 2] that changed the placement goal with respect to the male child, R.W. ("Child"), born in June of 2014. In addition, the order directed the WCCB to file a petition for the involuntary termination of parental rights, and, *inter alia*, reduced Mother's visitation with Child. Upon careful review, we affirm.

The trial court set forth the following factual and procedural background.

---

[1] It is well-settled that a permanency review order granting or denying a status change shall be deemed final and appealable when entered. **See In re H.S.W.C.-B**, 836 A.2d 908, 911 (Pa. 2003).

[2] The amended order directed that the November 2, 2016 permanency review order "shall be amended to appropriately reflect the date of filing of said Order, being December 12, 2016, as opposed to the date of the Hearing, being November 2, 2016." Order, 12/12/16.

Importantly, we observe that the docket entries in the Court of Common Pleas of Westmoreland County do not comply with the rules regarding entry of orders. **See** Pa.R.A.P. 301(a)(1); Pa.R.A.P. 108(b); Pa.R.C.P. 236(b). We caution the trial court to comply with the relevant rules for entry of orders so that appeal periods are properly triggered. **See Frazier v. City of Philadelphia**, 735 A.2d 113, 115 (Pa. 1999) (citations omitted) ("Thus, pursuant to the express terms of the rules, an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given").

Because the subject order was not entered on the trial court docket, the appeal period in this case was never formally triggered. It would be, at this juncture, a waste of judicial resources to remand the matter solely for the filing of a Rule 236(b) notice. Accordingly, in the interest of judicial economy, we will regard as done what should have been done and address these appeals on the merits.

On June 17, 2014, . . . days after the minor child's birth, an application for Shelter Care was requested by the [WCCB], and was granted. An Adjudicatory Hearing was held on July 2, 2014, and [C]hild was adjudicated dependent. Aggravated circumstances were found, in that child's half-sibling and Mother's child, A.M., was found to be the victim of Mother's aggravated physical neglect.[3]

The Pennsylvania Juvenile Act defines aggravated physical neglect as "[a]ny omission in the care of a child which results in a life-threatening condition or seriously impairs the child's functioning." 42 Pa.C.S.A. § 6302. In this case, A.M. suffered from horrific and life-threatening injuries perpetrated by the biological father of [Child],[4] and Mother was found to have neglected to provide appropriate prevention of and care for these injuries. At the time of [Child's] adjudication, Mother was incarcerated for the same. . . . At the time of the Order at issue, [C]hild had been in placement for twenty-nine (29) months.

Trial Court Opinion, 1/30/17, at 2 (unpaginated).

---

[3] A.M. is Child's half-brother, born in September of 2007. Aggravated Circumstances Order, 7/2/14, at ¶ 9. A.M., as well as three other half-siblings of Child, are Mother's children born during her prior marriage. *Id.* During the instant dependency action, Child's half-siblings were not in Mother's custody. Although it is not clear, we surmise from the certified record that, in a child custody proceeding between Mother and her ex-husband subsequent to A.M.'s injuries, the court granted sole legal and primary physical custody of the children to their father, and the court directed Mother to have no contact with the children. *Id.* at ¶ 22; N.T., 11/2/16, at Exhibit WCCB #1.

[4] Child's natural father, B.W.W. ("Father"), plead guilty to charges of aggravated assault, simple assault, and endangering the welfare of a child with respect to the injuries sustained by A.M. N.T., 11/2/16, at Father's #A. Father was sentenced to a term of incarceration of 12½ to 25 years. N.T., 5/18/16, at 5-6. As such, Father was incarcerated during the underlying dependency action, and the trial court prohibited any contact between him and Child.

The record reveals that the above-described criminal conduct by Father and Mother relating to A.M. occurred in February of 2014, at which time Mother was pregnant with Child. Aggravated Circumstances Order, 7/2/14, at ¶ 14. Mother pled guilty to the charge of endangering the welfare of children. By order dated February 20, 2015, Mother was sentenced to a term of incarceration of 6 to 23 months. Certified Docket #55, Child's Permanency Plan. Mother was incarcerated for three months in the Westmoreland County Prison, during which time the court granted her visits with Child twice per month. *See* Certified Record at #74 (Order of Court/Sentence); Order, 3/5/15. Thereafter, Mother was placed on Home Electronic Monitoring ("HEM") for three months. *See* Certified Record at #74 (Order of Court/Sentence). The revised Family Service Plan ("FSP") dated October 7, 2015, reflects that Mother was exercising visitation with Child in her home three times per week.[5] Mother remained on probation up through and including the time of the subject proceedings described below.

Permanency review hearings occurred at regular intervals throughout the underlying dependency matter. Mother's FSP goals were, in part, to participate in and successfully complete non-offender parenting treatment;

_____

[5] At all times relevant hereto, Mother resided in the home of her mother ("Maternal Grandmother"), which the Agency found appropriate for Child. N.T., 5/18/16, at 8.

attain and maintain a legal and verifiable source of income; and maintain appropriate housing. N.T., 5/18/16, at 17.

By way of background, on May 2, 2016, when Child had been in placement for 23 months, the Agency filed a petition for a permanency review hearing. The Agency asserted that it did not intend to file a petition for the involuntary termination of Mother's parental rights because it "would not serve the needs and welfare of the child: the mother has been making a lot of progress toward reunification." Petition, 5/2/16, at 4 (unpaginated).

The court held a permanency review hearing on May 18, 2016, at which time Mother exercised visitation with Child in her home for five days and four overnights per week. *Id.* at 13. The Agency recommended a "trial home visit" commencing at the conclusion of the hearing, which would involve Mother having physical custody of Child "24/7 for a three-month span" until the next review hearing, when the Agency would recommend reunification between Mother and Child. *Id.* at 19.

However, the testimonial evidence revealed that Mother, since November of 2015, had a new paramour, G.B., who did not reside with her. *Id.* at 51. On cross-examination, the Guardian *ad litem* ("GAL") inquired of the Agency caseworker, Rachel Skovira, whether the Agency performed an interstate criminal background check on G.B. The GAL stated, "[T]he reason I'm asking . . . is my recollection is [Father] had problems in North Carolina but none [in Pennsylvania] at the time that would have alerted Mother or

others [that Father posed a risk of harm to her children.] [Father had a criminal background] in another state, and that's the reason I'm asking that question." N.T., 5/18/16, and 51. Ms. Skovira testified, "[T]he prior caseworker did the background checks [on G.B.]. I don't know if she did the interstate checks." *Id.*

At the conclusion of the May 18, 2016 hearing, on the record and in open court, the trial court denied the Agency's recommendation for a "trial home visit." *Id.* at 57. The court ordered the Agency to conduct an interstate criminal background check on G.B. Thereafter, on May 23, 2016, the court issued a permanency review order after learning that G.B. had a criminal charge pending against him in Allegheny County involving possession of a controlled substance. The court maintained Mother's current visitation schedule, but it prohibited *unsupervised* contact between Child and G.B. Order, 5/23/16, at 3.

On October 13, 2016, when Child had been in placement for 27 months, the Agency filed another petition for a permanency review hearing, wherein it again asserted Mother "has been making a lot of progress toward reunification." Petition, 10/13/16, at 4 (unpaginated). The Agency asserted that it has not filed an involuntary termination petition because terminating Mother's parental rights would not serve the needs and welfare of Child. *Id.*

A hearing took place on November 2, 2016, during which the Agency renewed its request for a "trial home visit." N.T., 11/2/16, at 87. The

Agency presented the testimony of Benjamin Yaroch, a licensed clinical social worker who had provided twelve sessions of non-offending parenting counseling to Mother. He testified with respect to his October 27, 2016 report, wherein he recommended Mother continue outpatient psychotherapy and begin the next step in the reunification process with Child. *Id.* at WCCB #1. Specifically, Mr. Yaroch testified that the purpose of Mother's psychotherapy is to "use the skills learned in individual therapy to better her life and provide a safe and stable household for her son . . ., as well as to introduce [G.B.] into the therapeutic process . . . to discuss and encourage . . . insightful dialogue in regards to the . . . potential impact of [her] relationship [with G.B.] to the well-being of her son. . . ." N.T., 11/2/16, at 7-8. Mr. Yaroch testified that Mother accepted responsibility for Child's placement. He testified, "I think she genuinely takes responsibility for her role that led to the abuse of her children, and that was introduction of [Father] into her life." *Id.* at 11.

The Agency also presented the testimony of Nicole Dolhi, a therapist at Yaroch Counseling who made unannounced supervised visits at the family's residence. She testified that, based on her observations, Child has "a strong relationship" with Mother. *Id.* at 23. Further, the Agency presented the testimony of A.E., Child's foster mother. A.E. testified that Mother has been granted visitation on a five-day, four-day cycle for the last eight months, which involves Child moving back and forth between her and Mother in a 24-

hour period. *Id.* at 33, 37. She testified that this visitation schedule "is too hard on" Child. *Id.* at 37. She explained that the visitation schedule causes confusion for Child and makes him "very emotional" during transfers. *Id.* at 34.

Finally, the Agency provided the testimony of Rachel Skovira, the Agency caseworker from April 24, 2015, until September 26, 2016, and G.B., Mother's paramour. G.B. acknowledged that he had a criminal charge pending in Allegheny County, which he testified resulted from his possession of cocaine in March of 2016. N.T., 11/2/16, at 45, 50, 54. The trial court ordered G.B. to submit to a drug and alcohol test immediately following his testimony. *Id.* at 56-57.

Thereafter, Mother testified on her own behalf. Finally, the GAL provided the testimony of David Kindle, the Court-Appointed Special Advocate ("CASA"), with respect to his October 26, 2016 report. Mr. Kindle recommended that the "trial home visit should start . . . immediately." *Id.* at 107. He explained:

> I had concerns about the nature of the back and forth movement [between the homes of Mother and foster mother as testified to during the May 18, 2016 permanency hearing]. I have noticed a change in [Child's] overall demeanor. He is getting more withdrawn. His outbursts are longer and harder to console. I just see it as confusing and troubling to him.

*Id.*

At the conclusion of the testimonial evidence, the trial court received the results of G.B.'s drug and alcohol test and stated as follows on the record and in open court.

> And at this time the [c]ourt, on the record, has a urinalysis result for [G.B], and [G.B.] is positive for cocaine. And he has utilized and admitted to utilizing cocaine as of October 29, 2016. And today is November the 2nd, so it appears that that was conducted five days ago on a Saturday night.

*Id.* at 110.

At the conclusion of the hearing, the GAL stated on the record and in open court, "Unfortunately, I anticipated coming in agreeing with the [Agency], but, obviously . . . was unaware of what we would hear today." N.T., 11/2/16, at 114. As such, the GAL expressed a lack of agreement with the Agency's recommendation for the trial home visit. *Id.* at 113-114.

By order dated November 2, 2016, the trial court found that the current placement goal of reunification within three to six months "is NOT appropriate and/or NOT feasible." Order, 11/2/16, at 2 (emphasis in original). The court directed that the Agency "shall forthwith file a petition for Termination of Parental Rights regarding *both parents* in this case." *Id.* at 4 (emphasis added). In addition, the court directed that Mother's visitation be supervised by the Maternal Grandmother and be limited to alternating weekends. Further, the court directed that Child "shall have NO contact with [G.B.]." *Id.* at 3 (emphasis in original).

On December 29, 2016, the Agency timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i) and (b). On January 5, 2017, Mother timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Rule 1925(a)(2)(i) and (b). Father did not file a notice of appeal, and he is not a party to these appeals. The trial court filed its Rule 1925(a) opinion on January 30, 2017.

The Agency presents the following issues in its appeal:

[1.] Whether the [trial] court's findings relative to Mother's progress and compliance are supported by the evidence[?]

[2.] Whether the [trial] court abused its discretion in ordering the Agency to file termination of parental rights where sufficient evidence of compelling reasons existed to continue reunification efforts[?]

[3.] Whether the [trial] court erred in ordering termination of parental rights where a bond exists between Mother and Child[?]

Agency's Brief at 4 (unnecessary capitalization omitted).

Mother presents the following issues in her appeal:

I. Whether the trial court abused its discretion and committed an err[or] of law in ordering the [Agency] to file a termination of parental rights [petition] where the . . . [A]gency presented compelling reasons to continue reunification efforts[?]

II. Whether the [trial] [c]ourt erred as a matter of law and abused its discretion in ordering the [Agency] to significantly reduce visitation between Mother and the minor child[?]

Mother's Brief at 8 (answers omitted).

- 10 -

It is well-established that "goal change decisions are subject to an abuse of discretion standard of review." *In re R.M.G.*, 997 A.2d 339, 345 (Pa. Super. 2010) (citation omitted).

> In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was "manifestly unreasonable," that the court did not apply the law, or that the court's action was "a result of partiality, prejudice, bias or ill will," as shown by the record. We are bound by the trial court's findings of fact that have support in the record. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witness and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm, "even if the record could also support an opposite result."

*Id.* (citations omitted).

At permanency review hearings for dependent children removed from the parental home, a trial court must consider the factors set forth in the Juvenile Act, 42 Pa.C.S. § 6301 *et seq.*, as follows:

**(f) Matters to be determined at permanency hearing.—**

At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

. . .

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

> (i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;
>
> (ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or
>
> (iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

. . .

**(f.1)** *Additional determination.* — Based upon the determinations made under subsection (f) and all relevant

evidence presented at the hearing, the court shall determine one of the following:

. . .

**(2)** If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

. . .

42 Pa.C.S § 6351(f)(1)-(6), (9); (f.1)(2); **see also** Pennsylvania Rule of Judicial Court Procedure 1608(D)(3) (providing, "If the child has been in placement for fifteen of the last twenty-two months, the court may direct the county agency to file a petition to terminate parental rights").

We have stated that, "[t]hese statutory mandates clearly place the trial court's focus on the best interests of the child." **In re S.B.**, 943 A.2d 973, 978 (Pa. Super. 2008) (citation omitted). "Safety, permanency, and well-being of the child must take precedence over **all** other considerations." **Id.** (citation omitted) (emphasis in original).

Further, this Court has explained:

The agency is not required to offer services indefinitely, where a parent is unable to properly apply the instruction provided. **In re A.L.D.,** 797 A.2d 326, 340 (Pa. Super. 2002). **See also In re S.B., supra** at 981 (giving priority to child's safety and stability, despite parent's substantial compliance with permanency plan); **In re A.P.,** 728 A.2d 375, 379, (Pa. Super. 1999), *appeal denied,* 560 Pa. 693, 743 A.2d 912 (1999) (holding where, despite willingness, parent cannot meet "irreducible minimum parental responsibilities, the needs of the child must prevail over the rights of the parent"). Thus, even where the parent makes earnest efforts, the "court cannot and

- 13 -

will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.,* 901 A.2d 502, 513 (Pa. Super. 2006).

*In re R.M.G.*, 997 A.2d at 347.

Instantly, on appeal, Appellants argue that the trial court abused its discretion and/or committed an error of law by ordering that the Agency file a petition for the involuntary termination of Mother's parental rights. Specifically, they argue that Mother was in substantial compliance with the requirements of her permanency plan, and that her conduct does not warrant involuntary termination. In fact, the Agency asserts that Mother "should not be held accountable for her paramour's recreational drug use." Agency's Brief at 13. Further, Appellants argue that a bond exists between Child and Mother, and that termination would be contrary to the Child's needs and welfare. Lastly, Mother argues that the court abused its discretion in "suddenly and drastically reducing visitation from five . . . days and four . . . nights per week to just two . . . weekends per month." Mother's Brief at 19-20. We disagree.

In the subject order, the trial court indeed found that Mother has substantially complied with her permanency plan in that she has "positive interactions with the Child, . . . has attended twelve sessions of counseling with Ben Yaroch, in which she has been cooperative, and has obtained appropriate housing and daycare for the Child." Order, 11/2/16, at 1. However, the court disagreed with the Agency that Mother has made

substantial progress towards reunification and that it would not serve Child's

needs and welfare for the Agency to file an involuntary termination petition.

The court found:

> Mother has exhibited a course of conduct that could jeopardize the safety of the Child were they to be reunited at this time. The conduct centers around Mother's involvement with her current paramour, [G.B.]. In testimony, Mother admitted to lying to the caseworker about the extent of [G.B.]'s involvement with the Child. This contact was contrary to the May 18, 2016 Order of Court strictly prohibiting unsupervised contact between [G.B.] and the Child pending resolution of [G.B.]'s Allegheny County criminal case involving possession of a controlled substance. [G.B.], in testimony at this [h]earing, admitted prior drug use in his lifetime, but represented that a current drug screen would show a negative result. Upon being immediately subject to a drug screen, however, [G.B.] tested positive for cocaine. This misrepresentation is worrisome as [G.B.] appears heavily involved with the Child, and Mother and [G.B.] were apparently searching for a house to purchase together mere days before this [h]earing. The above factual scenario is even more troubling in light of the situation which led to the Child being adjudicated dependent in the first place, namely Mother's then-paramour and the Father of the Child committing serious acts of abuse against the Child's half-siblings and being criminally convicted of the same.[6] This pattern of disregard for the Child's safety in favor of her relationships with various paramours, as well as Mother['s] and her paramour's willingness to misrepresent facts to the Agency and this [c]ourt exhibits why the Agency's preceding reason does NOT constitute adequate justification for the Agency neither filing nor joining a petition to terminate parental rights.

---

[6] There is no evidence in the certified record before this Court that Father committed serious acts of abuse against any of Child's half-siblings other than A.M., as discussed *supra*.

Order, 11/2/16, at 2-3 (emphasis in original). The testimonial evidence supports the court's findings.

The evidence supports the court's finding that Mother lied to the Agency caseworker. It is important to note that the May 18, 2016 order permitted Child to be in the presence of G.B., but only when supervised. The testimony is ambiguous as to whether Mother complied with that order. Nevertheless, Ms. Skovira, the Agency caseworker, testified on direct examination as follows.

> Q. Has [Mother] acknowledged that she has continued to allow [G.B.] to see [Child] under either her or her mother's [Maternal Grandmother's] supervision?
>
> A. Well, when we spoke in September, she told me they had no contact since our last court hearing. Ben Yaroch informed me that they had three contacts since the last court hearing, and I asked about it to [Mother] this morning on why she wasn't truthful with me. She said that she felt that [Child and G.B.] had a bonded relationship, and she didn't want to take that away from [Child].
>
> And I'm guessing she was just scared to tell me the truth because she wasn't sure maybe what I wanted to hear.

N.T., 11/2/16, at 63.

Mother testified on direct examination with respect to her untruthfulness as follows.

> Q. The caseworker stated that you have been untruthful with her on some occasions. Can you describe the circumstances and . . . if you were untruthful?
>
> A. She had asked if [G.B.] had been around [Child]. And I don't know how to explain my thought process, but, yes, [G.B.] has been around [Child]. They had grown such a bond between

- 16 -

November and the last hearing in May that to take [Child] away from him, hurt [Child]. [Child] asked about him. [Child] wanted to see him, and it killed me to see [Child], yet again, losing somebody else that he was attached to. So, yes, I made a poor decision by not telling the caseworker, but as a mother, I watched my son go through withdrawal from him, because they do have a very strong bond.

Like [G.B.] said, one day [Child] says "G," the next day it's "daddy." That's who has stepped into [Child]'s life . . . as a father figure to [Child]. [Child] looks up to him. [Child] respects him.

*Id.* at 89-90. Thus, the testimonial evidence supports the court's factual finding in this regard. Further, we deem reasonable the court's conclusion that Mother's untruthfulness, in part, "exhibited a course of conduct that could jeopardize the safety of the Child were [he and Mother] reunited at this time." Order, 11/2/16, at 2.

With respect to G.B.'s illegal drug use, G.B. testified as follows on inquiry by the trial court.

Q. How long have you used cocaine?

A. Not very long, and I don't use it frequently. . . .

Q. Give me more of a better answer than "not very long." When's the first time you used cocaine? And you are 38 years old and now, so –

A. The first time I used cocaine would probably be three years ago.

Q. Any other drug use at all?

A. No. I used to smoke pot back in the day. I do not smoke pot anymore.

Q. What's back in the day?

- 17 -

A. I haven't smoked pot for over two years now.

Q. Did you smoke since you were a teenager up to two years ago?

A. Probably off and on since I was 22. I didn't really smoke when I was a kid.

Q. So for 14 years you smoked marijuana?

A. Off and on, here and there. It wasn't a habitual thing.

Q. It wasn't habitual thing?

A. No.

Q. So it was recreational use?

A. Yeah. Like I said, if I was somewhere and someone had it -- I'm just -- I try to be transparent with you.

*Id.* at 54-55.

With respect to G.B.'s representation about the results of a drug test if one were to be performed on the day of the hearing, G.B. testified on cross-examination by the GAL as follows.

Q. If the [c]ourt were to ask you to take a drug or alcohol test today, would you be available to do that?

A. I suppose.

Q. Are you currently under the influence of any kind of drugs or alcohol?

A. No.

Q. And include medications in that. Do you take any medications on a regular basis?

A. No.

Q. None?

A. I rarely even take Advil, but I did take some of that this morning because my back was hurting.

*Id.* at 51-52. Contrary to Appellants' assertion, we conclude that this testimony supports the trial court's finding that G.B. represented that a drug screen performed on the day of the hearing would render a negative result when, in fact, it did not.

Based on the foregoing testimonial evidence, the trial court inquired of Ms. Skovira whether the Agency is concerned about Mother's relationship with G.B.

Q. Does it cause you concern that [Mother] wants to perhaps. . . move in with [G.B.]?[7]

A. When we had the discussion, I offered [Mother] advice that she should try to get her own apartment and be on her own to be with [Child] before moving in with the boyfriend.

Q. And how was that received?

A. She wanted to move in with [G.B.]. . . .

Q. Contrary to the advice?

A. Yes. She said . . . she's a single mom, and . . . it would be hard for her to be a single mom in an apartment by herself with [Child].

_____

[7] Mother acknowledged on cross-examination by the GAL that she and G.B. were actively looking for a house together on the Sunday prior to the subject proceedings. N.T., 11/2/16, at 94-95.

Q. Now, you had asked her if [G.B.] had seen the child. She said, "no" from May through September?

A. Yes.

Q. And then you talk to Ben Yaroch, and he said there were three contacts, that he knows of, at least; correct?

A. Yes.

Q. So at that point in time, her v[e]racity is in question; correct?

A. Correct.

Q. And she lied to you?

A. Correct.

Q. So you know she's not lying to you about telling you that [G.B.] wasn't with this child in an unsupervised capacity?

A. I don't know if she's telling the truth.

Q. Does it not cause you concern that [Mother] wants to move in with a man who indicated through his testimony that he's been occasionally utilizing cocaine in the last three years and that he smoked marijuana for a period of 14 years, maybe more?

A. That is concerning.

*Id.* at 79-80. Nevertheless, Ms. Skovira explained on cross-examination by the GAL, "It causes us concern, but I feel, as an agency, we are just willing to, you know, give her a chance to reunify with him because everyone is still going to be involved with [Child]. And if she's still living with grandma, grandma will also be involved in [Child's] well-being." *Id.* at 77-78.

We conclude that the foregoing testimonial evidence supports the permanency review order. Indeed, upon careful review, we agree with the trial court's following conclusion.

[T]he record reflects examples of Mother's progress, but even more so Mother's continual, worrisome regression. The situation which led to [Child] being adjudicated dependent had to do with Mother being unable to put the needs of her children above those of a paramour. After [29] months with her child in Agency care, Mother is still displaying these behaviors in an unremitting pattern.

Trial Court Opinion, 1/30/17, at 4 (unpaginated).

Further, we agree with the trial court's reasoning in response to Appellants' arguments on appeal that Mother's conduct does not warrant termination of her parental rights and that termination would be contrary to Child's needs and welfare. The court stated they "are ripe for consideration at a termination proceeding. . . . [I]t was not an abuse of discretion for the [c]ourt to order the Agency to move forward toward an in-depth exploration of the same, bearing in mind [Child]'s need for permanency upon being placed in the child welfare system for upwards of [29] months." Trial Court Opinion, 1/30/17, at 4 (unpaginated).

Finally, with respect to Mother's issue wherein she asserts the court abused its discretion in significantly reducing her visitation, her argument is flawed. Mother asserts, "[r]eunification remains the goal of the WCCB, therefore visitation should not be limited." Mother's Brief at 19. This Court has held that, when the placement goal is reunification, visitation may not

be denied or reduced unless it poses a grave threat to the child. ***See In re C.J.***, 729 A.2d 89, 95 (Pa. Super. 1999). The subject order provided that the current placement goal of reunification "is NOT appropriate and/or NOT feasible." Order, 11/2/16, at 2 (emphasis in original). As such, pursuant to Section 6351(f.1)(2), *supra*, the court ordered the Agency to file petitions for the involuntary termination of Mother's and Father's parental rights. ***Id.*** at 4. Therefore, the subject order changed the placement goal from reunification to adoption. Mother's assertion fails.

We further reject Mother's argument that "the trial court did not make the needs of the minor child the paramount concern by not considering the potential emotional and psychological impact of suddenly and drastically reducing visitation. . . ." Mother's Brief at 19. Upon thorough review, we conclude that the trial court carefully considered the statutory mandates in light of the record evidence and placed its focus on the best interests of the Child. Specifically, it is important to note that the testimonial evidence of Child's foster mother, A.E., and the CASA, Mr. Kindle, discussed above, supports the order reducing Mother's visitation in that the frequency of the visitation transitions was having a negative effect on Child. We discern no abuse of discretion by the court in fashioning the subject order, which placed Child's safety, permanency, and well-being above all other considerations. ***See In re S.B.*** Accordingly, we affirm the order.

Order affirmed.

President Judge Emeritus Ford Elliott joins the opinion.

Judge Strassburger files a concurring and dissenting opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/18/2017