J-S78043-17

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| IN THE MATTER OF: R.W., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: WESTMORELAND | : | |
| COUNTY CHILDREN'S BUREAU | : | No. 1180 WDA 2017 |

Appeal from the Order Entered July 18, 2017
in the Court of Common Pleas of Westmoreland County
Orphans' Court at No(s): CP-65-DP-0000094-2014

BEFORE: OLSON, DUBOW, and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.: FILED JANUARY 29, 2018

The Westmoreland County Children's Bureau (WCCB) appeals from the permanency review order entered July 18, 2017, in the Court of Common Pleas of Westmoreland County, which maintained the placement of R.W. (Child), born in June 2014, in his current foster home. We affirm.

We summarize the relevant factual and procedural history of this matter as follows. WCCB obtained emergency protective custody of Child on June 14, 2014, and the orphans' court entered a shelter care order on June 25, 2014. On July 28, 2014, the court entered orders adjudicating Child dependent and finding aggravated circumstances as to J.M. (Mother), due to her aggravated physical neglect of Child's half-sibling, A.M. Specifically, the court found that Child's father, B.W. (Father), inflicted injuries to A.M.'s face and scrotum, and that Mother failed to seek medical treatment out of fear that she would be

_____

* Retired Senior Judge assigned to the Superior Court.

investigated for child abuse.[1]  Mother appealed the adjudication of dependency and aggravated circumstances finding, and Father appealed the adjudication of dependency.  This Court affirmed as to Mother on January 7, 2015, and affirmed as to Father on January 27, 2015.  See *In the Interest of R.W.*, 118 A.3d 440 (Pa. Super. 2015) (unpublished memorandum) (appeal of Mother); *In the Interest of R.W.*, 118 A.3d 456 (Pa. Super. 2015) (unpublished memorandum) (appeal of Father).

Meanwhile, both Mother and Father faced criminal charges stemming from A.M.'s injuries.  In February 2015, Mother pled guilty to endangering the welfare of children, and received a sentence of six to twenty-three months' incarceration.  Mother spent three months incarcerated, followed by three months on house arrest, before being paroled.  In January 2016, Father pled guilty to aggravated assault and endangering the welfare of children, and received a sentence of twelve-and-a-half to twenty-five years' incarceration.

Following her release from incarceration and house arrest, Mother made significant progress toward complying with Child's permanency plan.  Mother completed a parenting program, participated in non-offender's treatment, obtained employment, and resided with Child's maternal grandmother, L.C. (Maternal Grandmother).  Mother also participated in extensive visitation with Child.  By May 2016, Child was staying with Mother five days and four nights

_____

[1] The Honorable Meagan Bilik-DeFazio presided over Child's initial dependency proceedings.  The Honorable Harry Smail, Jr., began presiding over this matter in late July 2014.

per week, with occasional unannounced monitoring by Yaroch Counseling. Child's reunification with Mother appeared imminent.

However, Mother suffered a significant setback following a permanency review hearing on May 18, 2016. During the hearing, the orphans' court learned that Mother was in a relationship with a man named G.B. Because Mother was allowing G.B. to have contact with Child during visits, the court ordered WCCB to conduct an interstate background check. The background check revealed that G.B. was charged with driving under the influence of alcohol and possession of cocaine in March 2016.

During a subsequent permanency review hearing on November 2, 2016, G.B. admitted that he had used cocaine for approximately three years. N.T., 11/2/2016, at 54. The orphans' court directed G.B. to submit to an immediate drug screen, and he tested positive for cocaine. Id. at 56-57, 110. G.B. admitted to using cocaine on October 29, 2016. Id. at 110. In addition, the court heard testimony that Mother had been dishonest with WCCB about G.B.'s contact with Child. Mother informed WCCB that G.B. had no contact with Child following the May 18, 2016 permanency review hearing. Id. at 63. However, WCCB later learned that G.B. and Child had spent time together on three occasions. Id. at 63, 79.

Following the hearing, on December 12, 2016, the orphans' court entered a permanency review order reducing Mother's visits with Child from five days and four nights per week to alternating weekends from Friday to Sunday, supervised by Maternal Grandmother. The order further directed that

WCCB file a petition to terminate Mother's parental rights involuntarily.[2] Mother and WCCB appealed the order, and a panel of this Court affirmed on August 18, 2017.[3] In the Interest of R.W., 169 A.3d 129 (Pa. Super. 2017).

The orphans' court conducted its next permanency review hearing on July 10, 2017.[4] During the hearing, the court heard testimony that Mother moved out of Maternal Grandmother's home, so that Maternal Grandmother could be considered as a potential kinship placement for Child. N.T., 7/10/2017, at 71-72. Mother was now living with G.B., who had not tested positive for cocaine since the November 2, 2016 permanency review hearing. Id. at 17-18, 96. WCCB recommended that the court reunify Child with Mother. Id. at 82-83. Mother would move back in with Maternal Grandmother in order to facilitate reunification. Id. at 83, 109. In the alternative, WCCB

_____

[2] The orphans' court dated the order November 2, 2016. The court amended the order on December 15, 2016, to include a correct entry date of December 12, 2016.

[3] The author of this memorandum concurred and dissented, agreeing that the portion of the order directing WCCB to file a termination petition should be affirmed, but opining that the portion of the order reducing Mother's visits with Child substantially should be reversed. R.W., 169 A.3d at 140-41 (Strassburger, J., concurring and dissenting).

[4] The orphans' court continued the hearing from June 30, 2017. The record indicates that the parties "did start some of the testimony" on June 30, 2017. N.T., 7/10/2017, at 5. However, WCCB did not request that any testimony from June 30, 2017 be transcribed, and no transcript of a June 30, 2017 hearing exists.

recommended that the court remove Child from his current foster home and place him with Maternal Grandmother.  Id. at 82-83.

On July 18, 2017, the orphans' court entered a permanency review order maintaining Child's placement in his current foster home.  The order provided that Child's placement "is the least restrictive placement that meets the needs of [C]hild and there is no less restrictive alternative available, in that foster care is the least restrictive and family-like setting in which [C]hild's safety can be assured."  Permanency Review Order, 7/18/2017, at 1.  The order did not change Mother's visitation schedule.  WCCB timely filed a notice of appeal on August 14, 2017, along with a concise statement of errors complained of on appeal.[5]

> WCCB now raises the following issue for our review.
>
> Did the [orphans'] court err in finding [C]hild's placement is the least restrictive placement that meets the needs of [C]hild and abused its discretion: (a) where the Mother successfully completed services to allow reunification; and (b) where the Maternal Grandmother was approved for kinship foster care but the [c]ourt declined to place [C]hild?

WCCB's Brief at 4.[6]

_____

[5] As discussed above, WCCB recommended during the permanency review hearing that the orphans' court reunify Child with Mother.  Because WCCB was arguing in support of changing Child's permanent placement goal from return to parent or guardian to remain with parent or guardian, or terminating Child's dependency entirely, it is clear that this order is final and appealable.  See In re H.S.W.C.-B., 836 A.2d 908, 911 (Pa. 2003) ("An order granting or denying a status change… shall be deemed final when entered.").

[6] Two additional issues are listed in WCCB's statement of questions involved as withdrawn.

We review the order of the orphans' court pursuant to an abuse of discretion standard. In re R.J.T., 9 A.3d 1179, 1190 (Pa. 2010). As such, we must accept the court's findings of fact and credibility determinations if the record supports them, but we need not accept the court's inferences or conclusions of law. Id. "When the [orphans'] court's findings are supported by competent evidence of record, we will affirm, 'even if the record could also support an opposite result.'" R.W., 169 A.3d at 134 (quoting In re R.M.G., 997 A.2d 339, 345 (Pa. Super. 2010)).

Dependency proceedings are governed by the Juvenile Act, 42 Pa.C.S. §§ 6301–6375. The Act provides that a child may be adjudicated dependent if the orphans' court finds that he or she meets the requirements of one of ten definitions listed at 42 Pa.C.S. § 6302. If a court determines that a child is dependent, it must then enter an appropriate dispositional order. 42 Pa.C.S. §§ 6341(c), 6351(a); Pa.R.J.C.P. 1409(A)(1), 1509(D), 1515. Following adjudication and disposition, the court must conduct permanency review hearings at regular intervals. 42 Pa.C.S. § 6351(e)(3); Pa.R.J.C.P. 1607, 1608. Relevant to this appeal, courts must make a series of factual findings at each permanency review hearing. 42 Pa.C.S. § 6351(f)-(f.1); Pa.R.J.C.P. 1608. Based on these findings, courts must "order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child." 42 Pa.C.S. § 6351(g).

In addition, our Rules of Juvenile Court Procedure provide the following guidance on when and how a county agency may request modification of a child's placement.

A. County agency's duties.

(1) Emergencies.

* * *

(2) Non-emergent cases. In all other cases, the county agency shall seek approval of the court for a change in the child's placement prior to the removal of the child from the placement by the filing of a motion or a stipulation for modification of the dispositional order.

B. Contents of the motion. The motion for modification of the dispositional order shall include:

(1) the specific reasons for the necessity of change to the order;

(2) the proposed placement;

(3) the current location of the child;

(4) the manner in which any educational, health care, and disability needs of the child will be addressed;

(5) an averment as to whether each party concurs or objects to the proposal, including the child's wishes if ascertainable; and

(6) the signatures of all the parties.

C. Objections. If a party objects to proposed modification of the dispositional order, the objections shall be filed no later than three days after the filing of the motion for modification of the child's placement.

D. Court's duties. Once the county agency has requested approval from the court to modify a child's placement or after an emergency change in placement has already taken place, the court may:

> (1) schedule a prompt hearing to determine whether there will be a modification of the child's placement;
>
> (2) enter an appropriate order to modify the child's placement; or
>
> (3) enter an order denying the motion.

Pa.R.J.C.P. 1606.

In its opinion, the orphans' court found that it could not ensure Child's safety if he was returned to Mother's care, or placed in the care of Maternal Grandmother. Orphans' Court Opinion, 9/18/2017, at 2-3. The court emphasized the testimony of Terry O'Hara, Ph.D., a psychologist who raised concerns regarding Mother's lack of protective capacity, Maternal Grandmother's questionable physical health, and Maternal Grandmother's disregard for non-offender's treatment. Id.

On appeal, WCCB argues that the orphans' court erred or abused its discretion by maintaining Child's placement in his current foster home.[7] WCCB focuses its argument on the court's decision not to place Child in the care of

_____

[7] As noted above, the orphans' court found in its order that Child's current foster home is the "least restrictive placement" that meets his needs, and WCCB challenges that finding in its brief. This language appears in our Rules of Juvenile Court Procedure dealing with shelter care hearings, and the entry of dispositional orders removing a child from his or her home. The Rules provide that, in either situation, the court must determine whether "the child's placement is the least restrictive placement that meets the needs of the child, supported by reasons why there are no less restrictive alternatives available[.]" Pa.R.J.C.P. 1242(C)(3)(c); see also Pa.R.J.C.P. 1514(A)(2).

- 8 -

Maternal Grandmother. WCCB contends that Maternal Grandmother participated in a kinship study, including a physical examination, and was approved by WCCB as a kinship placement. WCCB's Brief at 11-13. WCCB further contends that Maternal Grandmother has family members who can assist her in caring for Child, including Mother, and that she can place Child in daycare. Id. at 13-14.

After a careful review of the record in this matter, we are constrained to conclude that the orphans' court did not abuse its discretion. During the permanency review hearing on July 10, 2017, Dr. O'Hara testified that he conducted a series of psychological evaluations, which included an individual evaluation of Mother, an interactional evaluation of Child and Mother, an individual evaluation of Maternal Grandmother, an interactional evaluation of Child and Maternal Grandmother, an interactional evaluation of Child and his foster parents, and an individual evaluation of G.B. N.T., 7/10/2017, at 12; WCCB Exhibits 1 and 2 (psychological evaluation reports).

Based on these evaluations, Dr. O'Hara opined that Child has a strong relationship with Mother, and that Child would benefit from extensive ongoing contact with her. N.T., 7/10/2017, at 13, 15. He explained, "I think that there were a lot of positives, not only noted by the collateral sources that I interviewed with regards to [Mother], but also [Mother's] comfort in herself with [Child]. I think that she showed a lot of positive skills." Id. at 15.

However, Dr. O'Hara further opined that Child would be at risk for neglect if the orphans' court were to return him to Mother's care. Id. at 40.

Dr. O'Hara explained that Mother underwent extensive non-offender's treatment, but that she still failed to display protective capacity in two recent instances. Id. at 13. First, Mother remained in a relationship with G.B. after she learned that he was arrested for driving under the influence of alcohol and possession of cocaine in March 2016. Id. at 14. Second, Mother remained in a relationship with G.B. after he tested positive for cocaine during a permanency review hearing in November 2016. Id. Dr. O'Hara expressed concern that, if Mother makes decisions that could endanger Child while "under the microscope" of court supervision, "I, without question, have concern what her choices would be if there's not this high level of involvement with the county and Court." Id. at 25.

With respect to Maternal Grandmother, Dr. O'Hara expressed concern that she lacks the physical ability to care for Child. Id. at 18. Dr. O'Hara explained that Maternal Grandmother is 70 years old, and suffers from "obesity … high blood pressure and borderline diabetes." Id. at 2-3. She is reportedly "completely exhausted" after caring for Child for extended periods of time. Id. Dr. O'Hara noted that "[e]ven walking up the stairs to my evaluation room, … seemed exceptionally draining for her[,]" and that she "exhibited labored breathing for several minutes after arriving into the evaluation room." Id. at 19; WCCB Exhibit 2 at 2.

Additionally, Dr. O'Hara questioned Maternal Grandmother's protective capacity. Dr. O'Hara explained Maternal Grandmother also participated in non-offender's treatment, but that she failed to participate meaningfully.

N.T., 7/10/2017, at 20. Rather than articulating what she learned in non-offender's treatment, Maternal Grandmother "was more dismissive of this service[,] indicating that she disliked it." Id. at 41. Maternal Grandmother also displayed defensiveness during her evaluation, such that "it would be unlikely for her to disclose pertinent issues to this case[.]" Id. at 19-20. Dr. O'Hara reported that he subjected Maternal Grandmother to a series of psychological tests, and that on "[s]ome of these validity scales ... she scored in a manner where persons are instructed to fabricate their experiences, or show no vulnerability, or that sort of thing. She scored in a similar range to persons who are instructed to present themselves positively." Id. at 41-42.

Thus, the record supports the finding of the orphans' court that it would be contrary to Child's best interest to return him to Mother's care. It was within the court's discretion to accept Dr. O'Hara's testimony, and to conclude that Mother lacks the protective capacity necessary to ensure Child's safety. Mother not only remained in a relationship with G.B. after learning of his arrest for driving under the influence of alcohol and cocaine possession in March 2016, but then continued to remain in a relationship with G.B. after he admitted to using cocaine for three years, and tested positive for cocaine during a permanency review hearing in November 2016. Mother now lives with G.B., and her willingness to protect Child should G.B. resume using cocaine in the future remains questionable.

The record also supports the conclusion of the orphans' court that Maternal Grandmother is not an appropriate kinship foster care placement.

Once again, it was within the court's discretion to accept the testimony of Dr. O'Hara. Maternal Grandmother's physical health is suspect, as demonstrated by her great difficulty walking up a flight of stairs, and her labored breathing for several minutes thereafter. Even assuming that Maternal Grandmother has the physical ability to care for Child, her defensiveness during psychological testing and her disregard for non-offender's treatment indicate that she too lacks the protective capacity necessary to ensure Child's safety.

Based on the foregoing, we conclude that WCCB has failed to meet the demanding burden of establishing that the orphans' court abused its discretion. See, e.g., R.W., 169 A.3d at 140 (Strassburger, J. concurring and dissenting) (citing Morgante v. Morgante, 119 A.3d 382, 386-87 (Pa. Super. 2015) ("This Court will not find an 'abuse of discretion' unless the law has been overridden or misapplied or the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence in the certified record.")). Therefore, we affirm the court's July 18, 2017 order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:   1/29/2018